Filed 10/11/22 P. v. Turpin CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H049252 |
| Plaintiff and Respondent, | (Monterey County Super. Ct. No. 19CR013783) |
| v. | |
| ELLIOT BRENT TURPIN, | |
| Defendant and Appellant. | |

## I. INTRODUCTION

Defendant Elliot Brent Turpin was convicted by jury of driving under the influence (DUI) of a drug (Veh. Code, § 23152, subd. (f)), misdemeanor possession of a controlled substance (Health & Saf. Code, § 11377, subd. (a)), misdemeanor possession of controlled substance paraphernalia (Health & Saf. Code, § 11364, subd. (a)), and misdemeanor driving with a license suspended due to a prior DUI (Veh. Code, § 14601.2, subd. (a)). The trial court found true prior conviction allegations regarding count 1 (Veh. Code, § 23550.5; Pen. Code, § 1170.12, subd. (c)(2)). Defendant was sentenced to six years in prison.

On appeal, defendant contends: (1) the evidence at trial did not establish the corpus delicti of the offense of DUI apart from defendant's out-of-court statements; (2) there is not substantial evidence that he was driving while under the influence of a

drug; (3) there is not substantial evidence that a drug sufficiently affected his ability to drive; and (4) the prosecutor committed misconduct in argument to the jury.

For reasons that we will explain, we will affirm the judgment.

## II. BACKGROUND

Defendant was charged by information with DUI of a drug with a prior specified felony conviction (Veh. Code, §§ 23152, subd. (f), 23550.5; count 1), misdemeanor possession of a controlled substance, methamphetamine (Health & Saf. Code, § 11377, subd. (a); count 2), misdemeanor possession of controlled substance paraphernalia (Health & Saf. Code, § 11364, subd. (a); count 3), misdemeanor driving with a license suspended due to a prior DUI with a prior specified conviction (Veh. Code, § 14601.2, subd. (a); count 4), and the infraction of failing to provide evidence of financial responsibility (Veh. Code, § 16028, subd. (a); count 5). Regarding the DUI count (count 1), the information also alleged that defendant had suffered two prior strike convictions (Pen. Code, § 1170.12, subd. (c)(2)).

### A. *The Trial*

The trial court granted defendant's request for a bifurcated trial on the alleged prior convictions, and defendant waived his right to a jury trial on those alleged priors. On motion of the prosecution, count 5, the infraction, was dismissed. The evidence presented to the jury regarding the remaining counts included the following.

### 1. Defendant's arrest

California Highway Patrol (CHP) Officer Peter Aguilar was driving his patrol vehicle on September 20, 2019, around 1:25 p.m., when he observed a Dodge Caravan parked "on a piece of abandoned property" in Salinas. The property was an empty lot about half an acre to an acre in size with a hill on it. The officer believed the lot was abandoned and that a homeless encampment existed on the property. It was unusual for a vehicle to be present.

2

The officer drove past the van, made a U-turn, and then positioned his patrol vehicle behind the van. The van was parked in a driveway, and the officer did not see any damage to the vehicle. The officer observed "a bunch of people" on a hill with plastic bags picking up trash and apparently "starting to clean up the property." He decided to conduct a "welfare check" with respect to the vehicle.

Before he exited his patrol vehicle, he saw defendant "no more than" 30 or 40 feet away, walking down the hill towards the van. The ground was mainly dirt and not perfectly level, and defendant did not stumble as he came down the hill. The windows in the van were rolled down, and the front passenger door was unlocked. Defendant opened the front passenger door and "did something inside the vehicle."

Officer Aguilar exited the patrol vehicle and contacted defendant to make sure everything was "okay." The officer asked defendant about his presence on the property. Defendant indicated that he had driven by himself to the property in the van, which he had just bought. He stated that he had arrived five minutes ago. Defendant indicated that he was going to help the landowner, who was on the hill, clean up the property.

Officer Aguilar asked his partner to talk to the landowner. The landowner indicated that she did not know defendant and that he was not there to clean up the property. When advised of the landowner's statement, defendant told Officer Aguilar that "he was barely going to talk to her."

At trial, the landowner testified that the van was already present when she arrived at the property. The CHP arrived about five minutes after her. The landowner estimated that there were four or five people cleaning the property at the time. She had never seen defendant before that day, and she did not ask him to come to her property.

Officer Aguilar saw keys in the van's ignition. He touched the hood, which was "warm to the touch," to confirm defendant's statement that he had just driven the vehicle. The van was green metal. The officer did not touch any other part of the van, so he did

3

not know whether the temperature of the hood was different than any other part of the vehicle.

When asked at trial whether the weather was "pretty warm" in Salinas, Officer Aguilar testified that "70's is warm to us" and that it was "nice that day." The officer testified that defendant was wearing a tank top and shorts, so it was "a warm day" to defendant. On cross-examination, the officer acknowledged "saying it was fairly warm the last time [he and defense counsel] talked."

When asked at trial whether there was anything to suggest that someone else had driven the van to the property, the officer testified, "[N]obody else was involved. [Defendant] pretty much claimed the vehicle was his, he drove it, didn't give a ride to any passengers or anything."

Officer Aguilar observed "objective signs of drug influence" in defendant. Defendant had rapid speech, constricted pupils, and red and watery eyes. At trial, the officer explained that a drug can cause hyperactivity and rapid speech is "kind of a clue." He acknowledged, however, that people who are stopped by law enforcement sometimes seem nervous, and that defendant "began to be nervous" when the officer contacted him. The officer testified that although red, watery eyes are not necessarily a sign of methamphetamine impairment, it is a "clue" of drug use. The officer acknowledged, however, that constricted pupils is not a sign of methamphetamine use.

When the officer asked defendant for his driver's license, registration, and insurance, defendant only provided a paper regarding insurance that was not in his name. He stated that he had not put anything in his name yet. Officer Aguilar determined that defendant's license was suspended for a prior DUI.

When asked where he had come from, defendant referred to an address that was about five miles away, which was where he was staying. The officer asked defendant about the belongings in the van, and defendant indicated that the items belonged to him.

4

When asked whether he had done any drug recently, defendant stated that he had smoked crystal methamphetamine "last night." He denied feeling the effects of the drug.

The officer twice checked defendant's pulse, which was 114 and 122. The average pulse of an adult male is 60 to 90 beats per minute. The officer testified that an elevated pulse is consistent with methamphetamine use.

By the time of trial in 2021, Officer Aguilar had been employed by the CHP for 25 years. He had received 52 hours of DUI training at the academy. He had also completed 24 hours of advanced drug training, which included learning about the seven major categories of drugs and the signs and symptoms of drug influence. Officer Aguilar completed an additional 72 hours of training and was certified as a drug recognition evaluator in 2001. This training was more in depth regarding the seven common drug categories and signs and symptoms. The training included performing tests on people who are under the influence and going through a 12-step process to determine whether a person is under the influence, under the combined influence of drugs and alcohol, or not under the influence at all. The officer had continually recertified since 2001. Over his career, he had been involved in "[p]robably over 500" DUI investigations.

Officer Aguilar testified that there are three standardized field sobriety tests to determine whether a person is under the influence of alcohol and/or drugs: (1) walk-and-turn, (2) one-leg stand, and (3) horizontal gaze nystagmus (eye test). The tests provide "clues" as to whether someone might be under the influence. The officer testified that the tests had been validated for use with alcohol impairment, and he believed "a couple" of validation studies had been conducted regarding drugs.

The officer acknowledged that horizontal gaze nystagmus had not been validated as being correlated with, for example, a certain level of methamphetamine impairment. Horizontal gaze nystagmus can be caused by a head injury. The officer also acknowledged that a person may not be able to perform satisfactorily on the one-leg stand if the person has a physical ailment or limitation.

5

Officer Aguilar performed various field sobriety tests on defendant. For a "[m]odified Romberg" test, Officer Aguilar instructs the person to put his or her feet together, hands at the sides, head tilted back, eyes closed, and then open the eyes and look at the officer after 30 seconds. In performing the test, defendant separated his feet, did not tilt his head back, and estimated 30 seconds after the passage of only 20 seconds. Officer Aguilar testified that defendant's distorted time perception was consistent with methamphetamine use. The officer also observed eyelid tremors, which were consistent with methamphetamine use. Regarding defendant's feet positioning, the officer explained that driving requires divided attention to, for example, hold the wheel, press the pedal, look at the surroundings, and react. The field sobriety test is like a divided attention test because it provides a clue as to whether a person can do two or more things at once. The officer testified that defendant probably did not listen to the direction to keep his feet together.

Defendant was next instructed to do a one-leg stand, which requires a person to raise one foot about two to six inches from the ground, with hands at the sides, and counting out loud starting from 1001 until the officer stops the person after 30 seconds. Defendant attempted the test but told the officer that he could not complete the test due to past surgeries and pain. He later told the officer that he had a "hernia issue." These issues could cause difficulty in performing some of the field sobriety tests.

Officer Aguilar then conducted the horizontal gaze nystagmus test. This test requires the person to put hands at the sides and feet together. The officer places a stimulus in front of the person's eyes and determines whether the person can track the stimulus and whether there is "smooth pursuit." The officer looks for nystagmus or involuntary jerking of each eye. Defendant exhibited a "lack of smooth pursuit in both eyes," "nystagmus at the extremes in both eyes," and "an angled onset in both eyes." The officer acknowledged at trial that nystagmus is associated with alcohol use and some

6

drugs, but not methamphetamine, and that there are people who have "natural nystagmus."

During his 25 years of experience with the CHP, Officer Aguilar had come across a lot of people under the influence of methamphetamine. He also had training about the signs and symptoms of methamphetamine impairment. During his interaction with defendant, the officer found defendant to be acting consistent with someone who was under the influence of methamphetamine. The officer advised defendant that he was going to be arrested for DUI and that he would be taken to a CHP office for a drug evaluation.

Officer Aguilar began a vehicle inventory in anticipation of the van being stored or impounded. In the center console, he found an orange bottle with a plastic baggie inside. The plastic baggie contained a rock-like or crystallized substance, which the officer believed to be methamphetamine. Next to the bottle, he found a "homemade water pipe for smoking" which had "white residue in the smoking area." The officer testified that the device is commonly used to smoke methamphetamine. He also testified that the white residue appeared "fresh" as if it had been used recently.

Defendant admitted the orange bottle was his and that it contained crystal methamphetamine. Subsequent testing confirmed that it was 0.704 grams of methamphetamine, which is a usable amount.

Defendant requested that the van not be towed because it contained his belongings. The officer attempted to call defendant's friend at the address from where defendant had driven, but the friend did not answer. Defendant then requested that the officer leave the van with a friend "who's here." The van was released to defendant's friend, who was on the top of the hill with the landowner cleaning up the property. The friend agreed to secure the vehicle.

## 2. Drug recognition evaluation of defendant

Defendant was subsequently taken to a CHP office in Salinas for a drug evaluation conducted by CHP Officer Skylar Eckerfield. At that time, Eckerfield had been a CHP officer for about three years. He had completed 50 hours of training regarding standardized field sobriety tests and a three-day class regarding advanced roadside impaired driving enforcement. At the time of defendant's evaluation, Officer Eckerfield was in the process of completing certification to become a drug recognition expert. The purpose of becoming a drug recognition expert is to be able to identify which of seven drug categories a person may be under the influence of. Officer Eckerfield had completed the classroom portion of the training and was in the process of completing the hands-on or practical application of the training. The evaluation of defendant took place on the first day of the officer's three-day hands-on training, and the officer was ultimately certified as a drug recognition expert at the conclusion of the training. By the time of trial, Officer Eckerfield had witnessed or conducted approximately 1,000 DUI investigations and more than 20 drug recognition evaluations, of which at least a handful involved methamphetamine.

A drug recognition evaluation is a 12-step process that includes finding out the circumstances of the arrest from the arresting officer, interviewing the arrestee, eye exams, and tests having mental and physical aspects. The interview of the arrestee includes a medical screening and other background questions regarding whether they drank and when they ate or slept.

Officer Eckerfield began the drug recognition evaluation of defendant just before 2:00 p.m. Defendant's speech was normal, and he was calm and cooperative. During the medical screening, defendant indicated that he had a broken back and knees and that he had sustained a concussion in a traffic collision at some prior point. Defendant also believed that he had high blood pressure although he had not been diagnosed with that

8

condition. Based on the medical screening, defendant met the guidelines for being able to perform the tests that were conducted by Officer Eckerfield.

Defendant admitted that he had been using methamphetamine for years and that he had smoked methamphetamine in the early morning around 1:00 a.m.

Officer Eckerfield had defendant perform several tests to evaluate whether he was impaired. The officer explained that people tend to correctly perform some of the time, so one clue on one test would not be indicative of impairment. The evaluator must look at all the clues together.

The officer observed several clues with defendant that were associated with impairment. For example, on the walk-and-turn test, defendant had a balance issue and stepped off the line during the instructional portion, and he made an improper turn. Defendant did not indicate that any of his physical limitations affected his ability to do the turn. During the one-leg stand, he failed to count as instructed, and he was swaying. He also displayed leg tremors, which are associated with methamphetamine use. During the finger-to-nose test, defendant touched his nose with the pad of his finger instead of the tip of the finger. He did correctly touch his finger to his nose twice, but the "rest of the times he did not." However, during a "[m]odified Romberg" test, which is a test of someone's internal clock, defendant estimated 30 seconds had passed after 34 seconds elapsed. An estimate within five seconds is considered to be within range for someone who is not under the influence.

Methamphetamine is a central nervous system stimulant. Signs and symptoms associated with methamphetamine use include elevated pulse, high blood pressure, elevated body temperature, rigid muscle tone, potentially dilated pupils, and being talkative. An individual may not necessarily display all the signs and symptoms of intoxication. Defendant's pulse was elevated each of the three times it was checked, with readings of 120, 116, and 114, and his blood pressure was "quite elevated." He was also talkative, meaning more than the average person during a normal conversation.

However, his body temperature was low at 96.2. His eyes also reacted within normal range to light although "[t]hey were slow."

Defendant had blistering or raised bumps on his tongue, which was consistent with smoking methamphetamine. Officer Eckerfield explained that when a person smokes methamphetamine with a glass pipe, a torch is used to "super heat it." When the person inhales, the inside of the mouth is burned.

At the end of the evaluation, Officer Eckerfield determined that defendant was too impaired to drive a vehicle due to methamphetamine. This conclusion was based on (1) defendant's inability to complete divided attention tasks where a person must do more than one thing at a time, (2) the objective signs and symptoms of intoxication, and (3) defendant's admitted methamphetamine use. At trial, Officer Eckerfield testified that defendant's presentation that day was consistent with other people the officer had tested who were "chronic" or "more tolerant users" of methamphetamine.

Based on the results of the evaluation, Officer Eckerfield determined that defendant should take a chemical test.

### 3. Toxicology testing of defendant

Defendant was transported to a medical center for a blood draw for a toxicology test. A criminalist from the state Department of Justice's toxicology lab analyzed defendant's blood sample and testified as an expert in testing narcotics and impairment.

The criminalist detected methamphetamine in defendant's blood at 312 nanograms of per millimeter and amphetamine at 67 nanograms per millimeter. Amphetamine is a central nervous system stimulant like methamphetamine. Amphetamine can be taken independently, or it can be a metabolite of methamphetamine, meaning a product produced by the body when it metabolizes the methamphetamine.

The criminalist testified that the level of methamphetamine or amphetamine in a person's body does not correlate to impairment. However, the therapeutic level for methamphetamine, such as the prescription dosage for severe obesity and narcolepsy, is

about 100 nanograms per milliliter. The criminalist explained that "anything above that would be considered recreational."

Methamphetamine can be detected in a person's blood for two to three days. A person may feel the effects of methamphetamine for four to eight hours, and there may be residual effects up to 12 hours. In other words, "generally speaking" it is "possible" that a person would not be feeling the effects of the drug 12 hours later.

The criminalist testified that a person under the influence of methamphetamine may have the following signs and symptoms: dilated pupils, high pulse rate, high blood pressure, high body temperature, sweaty, rigid muscle tone, muscle and coordination issues, rapid speech, and a sped-up perception of time. A person under the influence of methamphetamine will not necessarily show all these signs and symptoms. Further, chronic users may have constricted pupils instead of dilated pupils. Their pupils have been dilated for so long that their eye muscles get weak, they have eye fatigue, and their pupils are chronically constricted.

The criminalist explained that although a person who is under the influence, or feeling the effects of the drug, is "likely" impaired, impairment is a "separate decision" or "separate concept[]" from being under the influence. To render an opinion on impairment, the criminalist needed to see evidence of mental or physical impairment. Impairment may be demonstrated by driving patterns and field sobriety tests for example.

Driving is a "complex divided attention task," "requir[ing] the driver to process information, streetlights, signs, anything going on like . . . kids or people in the walkways." At the same time, the person must physically operate the car by steering, breaking, and using the gas pedal.

Signs of mental impairment from methamphetamine may include being confused, a sped-up perception of time, not understanding directions, and focusing singly on a task while having issues with divided attention tasks. A driver impaired by methamphetamine may drive too fast, fail to respond to red lights, make aggressive lane changes, and have

11

their vision impaired by dilated or constricted pupils that affect how much light is getting into their eyes. Physical coordination issues and muscle rigidity may affect the ability to operate the steering wheel and brake pedals appropriately.

The criminalist explained, however, that "it's not uncommon for impaired people to be able to do a familiar task for a short period of time. So if they're driving a familiar car on a familiar route, . . . they can do those and not appear impaired. It's when something abnormal happens. So a light turns red and they weren't ready for it. Or a soccer ball goes in the road. . . . Then they may show their impairment."

According to the criminalist, field sobriety tests are "simple divided attention tasks." They are designed to ask a person to do more than one thing at a time, which allows for an assessment of the person's ability to follow directions and whether they are displaying mental or physical impairment. The following symptoms are consistent with methamphetamine impairment: estimating 20 seconds as 30 seconds, poor balance, and failing to follow instructions like turning improperly. The criminalist would not "weight heavily" the failure to properly touch the tip of the finger to the tip of the nose, because it "[s]eems like a lot of individuals have trouble touching the actual tip to the tip."

The criminalist was given the following hypothetical about a person's signs and symptoms and performance on field sobriety tests: red, watery eyes; constricted pupils; rapid pulse measured at 114 and 122 beats per minute; rapid speech and movements; elevated blood pressure; blistering on the tongue; on a "[m]odified Romberg test" the person estimated 20 seconds as 30 seconds, was rigid, and separated the feet; unable to maintain balance during the instruction phase of the walk-and-turn, separated the feet and stepped off the line, and improperly turned; displayed leg tremors during the one-leg stand; failed to correctly touch the tip of the finger to the tip of the nose during the finger-nose test; and a blood sample showed a level of 312 nanograms of methamphetamine per milliliter and 67 nanograms of amphetamine per milliliter.

12

The criminalist testified that the person "would be too impaired to operate a motor vehicle safely" based on the following facts from the hypothetical: constricted pupils, rapid pulse that was measured more than once to "counteract" the idea that the person might have been nervous, rapid speech and movements, estimated 20 seconds, rigid muscle tone, separating the feet during a Romberg test, elevated blood pressure, inability to maintain balance, turned incorrectly during the walk-and-turn, leg tremors, and methamphetamine and amphetamine detected in toxicology.

The criminalist testified that horizontal gaze nystagmus is not a sign of methamphetamine impairment. Low body temperature is not consistent with methamphetamine use. A person who estimates 30 seconds after the passage of 34 seconds would be considered to have a normal perception of time and that would not be consistent with methamphetamine impairment. The criminalist testified that taking these other facts into consideration would not change the criminalist's opinion that the person in the hypothetical was too impaired to operate a vehicle safely. The criminalist explained that not every person who is impaired by methamphetamine would display every possible sign of impairment.

At some point during the investigation by law enforcement, defendant submitted to an alcohol test, which indicated that he did not have any alcohol in his system.

The parties stipulated that defendant's "license was revoked on September 20th, 2019, due to a prior driving under the influence conviction," and that "he had knowledge that it was revoked."

### 4. The defense case

Christian Martorana testified as an expert in performing drug recognition examinations. Martorana owned a consulting business and was formerly a CHP officer for almost 19 years. As a cadet in the CHP academy, Martorana received approximately 50 hours of field sobriety test training and drug impairment training. He was a "DRE" (drug recognition expert or evaluator) and eventually became an instructor for the

13

advanced roadside impairment class and for the drug recognition evaluator program, where he trained people on field sobriety tests. Martorana tried to read literature regularly and keep up to date on advances in the field of drug recognition evaluation and field sobriety tests.

Martorana testified that a recreational methamphetamine user normally has dilated pupils whereas a long-term user's eyes will stay within a normal range or will otherwise "be tolerant to the pupil dilating effects." At the same time, if a person's eyes are within normal range, the person is not necessarily a methamphetamine user.

Martorana also testified that if a person estimated 30 seconds in 34 seconds, then that would not be reflective of someone who was impaired by methamphetamine. He also indicated that an internal body temperature of 96.2 degrees was not indicative of methamphetamine use. Likewise, if a person walked down a hill without stumbling or without an unusual walk, then there would not be a sign of impairment. Similarly, a person who is talkative might not necessarily be impaired by methamphetamine, as it depends on the person's speech pattern and how they normally talk.

Martorana testified that if a person reported using methamphetamine at 1:00 a.m., then 12 hours later the drug is "probably not going to be in their system, or it's going to be on the down side." He would not expect to see impairment in that circumstance, but he would want to do "[a]ll 12 steps" of a "complete drug recognition evaluation."

Similarly, if a person touches the tip of his or her nose with the pad rather than the tip of the finger, or had horizontal gaze nystagmus, that does not indicate methamphetamine impairment. Further, if the person had previously broken both knees and back and suffered a concussion from a traffic collision a year prior, then the fact that the person stepped off the line while standing for the walk-and-turn test would not suggest that the person was too impaired by methamphetamine to operate a vehicle. Martorana testified that before field sobriety tests are administered, the person should be

asked about medical conditions, whether the person is able to do the test, and why they cannot do the test, and the information should be documented in the report.

Martorana testified that various tests, including the finger-to-nose, horizontal gaze nystagmus, one-leg stand, and walk-and-turn, had not been validated for use in drug evaluations. The tests had only been validated to show clues regarding whether a person was impaired by alcohol.

Nevertheless, as an experienced officer out in the field, Martorana conducted drug recognition evaluations on people who he suspected of being under the influence of methamphetamine. He used the tests that had been discussed during trial, including the "[m]odified Romberg" and finger-to-nose, to make arrests of people who were under the influence of methamphetamine. He had also trained CHP officers and allied agencies to use the tests.

Martorana believed the "totality of the 12 steps" of a drug recognition evaluation were appropriate to determine whether a person was under the influence of methamphetamine. He also acknowledged that the tests were a "useful tool" for deciding whether a chemical test was needed. To determine whether someone was under the influence, a CHP officer was trained to look at the "totality" and not "one isolated thing" which could easily be explained away.

Martorana was given the following hypothetical: a person is walking without stumbling and gets into a car with no problem; his speech is normal and talkative; he is calm and cooperative; his pulse is elevated at 120, 116, and 114; he estimates 30 seconds in 34 seconds; he touches the tip of his nose occasionally with the pads of his fingers and tips of his fingers; his internal temperature is 96.2 degrees; his eyes dilate in room light and darkness; he has knee and back issues from an injury from a year ago; he steps out of place at the beginning of the walk-and-turn and does not do the turn correctly; he has some muscle rigidity and balance issues on the one-leg stand; he reported using methamphetamine at 1:00 a.m. and it was currently a little past 1:00 p.m.; the person's

15

vehicle is not parked in an unusual manner; there is no damage to the car; and there were no reports of speeding, aggressive driving, or running red lights. Martorana testified that based on these facts he would not be able to say the person was impaired for purposes of driving. In other words, it was "unknown" whether the person was too impaired to drive. He acknowledged that if more facts were added, it could change his opinion.

Martorana acknowledged that people are not always truthful in disclosing drug use, and they may minimize the extent of their use.

Martorana testified that with his consulting business, he had testified in court as a DRE expert for the defense in several cases. For this case, there was a "set budget of $1500" but he did not think the amount paid would actually reach that amount. Martorana stated that he would not testify in a certain way just because he was getting paid by a defense attorney. He had in the past turned down cases where the defendant was impaired, or advised the defense attorney that he would not take the case to trial in view of the evidence.

Defendant did not testify at trial.

**B.** *Jury Verdicts and Sentencing*

The jury found defendant guilty on all four counts: DUI of a drug (Veh. Code, § 23152, subd. (f); count 1), possession of a controlled substance (Health & Saf. Code, § 11377, subd. (a); count 2, a misdemeanor), possession of controlled substance paraphernalia (Health & Saf. Code, § 11364, subd. (a); count 3, a misdemeanor), and driving with a license suspended due to a prior DUI (Veh. Code, § 14601.2, subd. (a); count 4, a misdemeanor). In a bifurcated proceeding, the trial court found true the prior conviction allegations regarding count 1 (Veh. Code, § 23550.5; Pen. Code, § 1170.12, subd. (c)(2)). Regarding count 4, the court found not true the prior specified conviction allegation. Defendant was sentenced to six years in prison.

16

### III. DISCUSSION

**A. *Proof of Corpus Delicti***

Defendant contends that the evidence at trial did not establish the corpus delicti of the offense of DUI apart from his out-of-court statements.

#### 1. General Legal Principles

The corpus delicti rule "precludes 'convictions for criminal conduct not proven except by the uncorroborated extrajudicial statements of the accused. [Citations.] [It] is intended to ensure that one will not be falsely convicted, by his or her untested words alone, of a crime that never happened.' [Citation.] ' "The amount of independent proof of a crime required [to satisfy the corpus delicti rule] is quite small." [Citation.] The prosecution need not adduce "independent evidence of every physical act constituting an element of an offense." [Citation.] Instead, it need only make "some indication that the charged crime actually happened," so as to ensure "that the accused is not admitting to a crime that never occurred." ' [Citation.] 'The independent proof may be circumstantial and need not be beyond a reasonable doubt, but is sufficient if it permits an inference of criminal conduct, even if a noncriminal explanation is also plausible.' [Citation.]" (*People v. Gonzalez* (2021) 12 Cal.5th 367, 381-382 (*Gonzalez*).) " 'The inference [that a crime has been committed] need not be "the only, or even the most compelling, one . . . [but need only be] a *reasonable* one." ' [Citations.]" (*People v. Ledesma* (2006) 39 Cal.4th 641, 722 (*Ledesma*).)

In this case, defendant was charged with DUI of a drug. (Veh. Code, § 23152, subd. (f); count 1.) "The corpus delicti of the offense of driving under the influence consists of proof that the automobile was being driven by some person who was under the influence of alcohol" or a drug. (*People v. Martinez* (2007) 156 Cal.App.4th 851, 855 (*Martinez*), abrogated on other grounds in *People v. Jones* (2012) 54 Cal.4th 350, 357-358.)

## 2. Analysis

In this case, "[g]iven the low quantum of proof that is required, we are satisfied that the prosecution provided the ' "minimal" ' amount of independent evidence necessary to satisfy the corpus delicti rule. [Citation.]" (*Gonzalez, supra*, 12 Cal.5th at p. 382.)

First, there was evidence that defendant was associated with the van and that he had recently driven it. Officer Aguilar saw defendant open the passenger door and "d[o] something in the vehicle." The officer testified that it was unusual for a vehicle to be present on the seemingly abandoned property. During the officer's entire contact with defendant, no one else on the property came forward to claim the vehicle. Further, instead of having the vehicle stored or impounded upon defendant's arrest, Officer Aguilar attempted to call someone at a different location to come and take the vehicle for defendant, and the officer ultimately released the vehicle to someone already at the property who agreed to secure the vehicle for defendant. A reasonable inference arises from this evidence that the vehicle was associated with defendant rather than anyone else who was present on the property at the time, and that defendant had been the person who had driven the vehicle to that location. The evidence also indicated that defendant had recently driven the vehicle, as the keys were still in the ignition and the hood was "warm to the touch."

On the latter point, although the officer acknowledged that the weather was "nice that day" and that defendant was a wearing a tank top and shorts, the officer had more than 20 years of experience on "[r]oad patrol" for the CHP and he touched the hood to "try[] to confirm . . . if it was still kind of warm or hot" because "[u]sually that indicates the vehicle had just been driven." The clear implication from the officer's testimony is that he believed the heat generated from the engine under the hood accounted for the warmth of the hood rather than from the "nice" weather outside.

Second, there was evidence that defendant was under the influence of methamphetamine. The criminalist testified that a person under the influence of methamphetamine may have the following signs and symptoms: dilated pupils, high pulse rate, high blood pressure, high body temperature, sweaty, rigid muscle tone, muscle and coordination issues, rapid speech, and a sped-up perception of time. A person under the influence of methamphetamine may not necessarily show all these signs and symptoms. Further, chronic users may have constricted pupils instead of dilated pupils. The criminalist indicated that impairment from methamphetamine may be demonstrated by field sobriety tests, which, similar to driving, involve divided attention tasks. The criminalist testified that, hypothetically, a person with the following symptoms "would be too impaired to operate a motor vehicle safely": constricted pupils, rapid pulse, rapid speech and movements, estimating 20 seconds as 30 seconds, rigid muscle tone, separating the feet during a Romberg test, elevated blood pressure, inability to maintain balance, turning incorrectly during the walk-and-turn, leg tremors, and methamphetamine and amphetamine detected in toxicology.

Here, methamphetamine was detected in defendant's blood at a level greater than the therapeutic amount. Further, when defendant was first contacted by Officer Aguilar, the officer found defendant to be acting consistent with someone who was under the influence of methamphetamine, based on the officer's interactions with people under the influence of methamphetamine over the course of his nearly 25 years as a CHP officer, his training and continuous certification for nearly two decades as a drug recognition evaluator regarding the signs and symptoms of methamphetamine impairment which he observed in defendant, and defendant's performance on field sobriety tests. This included rapid speech, constricted pupils, two elevated pulse readings, eyelid tremors, and, during the "[m]odified Romberg" test, a sped-up perception of time and failure to keep his feet together and tilt his head back.

19

Officer Eckerfield similarly determined after a 12-step drug recognition evaluation that defendant was too impaired to drive a vehicle due to methamphetamine based on, among other things, (1) the objective signs and symptoms of intoxication and (2) defendant's inability to complete divided attention tasks as reflected in certain tests. For example, defendant's pulse was elevated each of the three times it was checked, with readings of 120, 116, and 114, and his blood pressure was "quite elevated." He was also talkative, meaning more than the average person during a normal conversation. Regarding defendant's performance on various tests, on the walk-and-turn defendant had a balance issue and stepped off the line during the instructional portion, and he made an improper turn. During the one-leg stand, he failed to count as instructed, and he was swaying. He also displayed leg tremors, which are associated with methamphetamine use.

On this record, in view of the expert testimony regarding impairment and the investigating officers' observations, including regarding defendant's performance on various tests, we determine that the prosecution "provided the ' "minimal" ' amount of independent evidence necessary to satisfy the corpus delicti rule" (*Gonzalez*, *supra*, 12 Cal.5th at p. 382) with respect to proof that defendant had driven the van while under the influence of methamphetamine. (See *Martinez*, *supra*, 156 Cal.App.4th at p. 855.)

On appeal, defendant cites *People v. Nelson* (1983) 140 Cal.App.3d Supp. 1 (*Nelson*), *People v. Moreno* (1987) 188 Cal.App.3d 1179 (*Moreno*), and *People v. Kelley* (1937) 27 Cal.App.2d Supp. 771 (*Kelley*) to support his contention that the corpus delicti rule was not satisfied in the present case.

We find these cases distinguishable. In *Nelson*, the vehicle's two occupants, one of whom was the intoxicated defendant, were ejected from the vehicle after it hit a guardrail. (*Nelson*, *supra*, 140 Cal.App.3d. at p. Supp. 3.) The superior court appellate department determined that there was no evidence, other than the defendant's statement, as to who was the driver, and thus it was "just as likely that the other man . . . was driving

20

the vehicle." (*Id.* at p. Supp. 4.) In *Moreno*, when the police arrived at the scene of a damaged truck that had hit a telephone pole, there was no one in the truck. (*Moreno*, *supra*, 188 Cal.App.3d at pp. 1189-1190.) Several people "were present in the immediate vicinity" of the truck, while the defendant, who was the registered owner of the truck, "was located inside the nearby" market. (*Id.* at p. 1190; see also *id.* at p. 1191.) The appellate court determined that "the prosecution failed to establish by exclusion of other possible drivers that defendant had, in fact, been driving the pickup at the time of the accident while under the influence of alcohol." (*Id.* at p. 1191.) In *Kelley*, which appears to have examined the sufficiency of the evidence rather than whether the corpus delicti rule was satisfied, the defendant and a young woman were standing at the scene of the car accident. (*Kelley*, *supra*, 27 Cal.App.2d at p. Supp. 772.) The superior court appellate department determined that "the inferences point no more strongly to [the defendant] as the one who had been driving it than to the young woman who appears to have been his companion." (*Id.* at p. Supp. 773.)

In contrast to *Nelson*, *Moreno*, and *Kelley*, where there were one or more individuals in the immediate vicinity of the vehicle in addition to the defendant, in this case there was no one except defendant within the immediate vicinity of the vehicle. As the appellate court in *Moreno* explained, "people in proximity to a vehicle are more likely to have some connection to the vehicle, whether driver or passenger, than people located at some distance away. Thus, when it is established by competent evidence that no one in the reasonable vicinity except the suspect acknowledges having been the driver of the car and the suspect has some demonstrable connection with the vehicle, it then becomes a reasonable inference from circumstantial evidence that the suspect was, in fact, the driver." (*Moreno*, *supra*, 188 Cal.App.3d at p. 1189; accord, *People v. Scott* (1999) 76 Cal.App.4th 411, 418.) The appellate court further stated, "Obviously, the nearer the suspect is to the vehicle, such as the case in which the defendant was found leaning up

21

against the car, the stronger the inference of driving [citation]." (*Moreno*, *supra*, at p. 1190.)

In this case, when Officer Aguilar contacted defendant at the vehicle, there was no one else in the immediate vicinity of the vehicle. Officer Aguilar saw defendant doing "something in the vehicle," the keys were still in the ignition, and the vehicle's hood was warm. Although there was a handful of people on a hill cleaning the property some distance away, there was no evidence linking the vehicle to any of these other people. Throughout the entire time that law enforcement was present, no one stepped forward to claim the vehicle, and law enforcement ended up having to initiate contact with a person on the property to secure the vehicle for defendant instead of having it stored or impounded. Significantly, " '[t]he inference [that defendant drove the vehicle] need not be "the only, or even the most compelling, one . . . [but need only be] a *reasonable* one" ' " (*Ledesma*, *supra*, 39 Cal.4th at p. 722) to satisfy the corpus delicti rule. Here, it is reasonable to infer that the vehicle had not been under the control of anyone else at the property that day other than defendant and that the vehicle had been driven to that location by defendant.

Defendant also contends that "there is nothing to corroborate the assumption that he smoked prior to driving, as opposed to at the homeless camp. Each are reasonable explanations for the circumstantial evidence." As we have set forth above, " '[t]he inference [that a crime has been committed] need not be "the only, or even the most compelling, one . . . [but need only be] a *reasonable* one." ' [Citations.]" (*Ledesma*, *supra*, 39 Cal.4th at p. 722.) Here, defendant's own argument that at least one "reasonable explanation[]" for the circumstantial evidence is that "he smoked prior to driving" is sufficient, along with the other evidence we have described above regarding his driving and his impairment, to establish the corpus delicti of the offense of DUI. (See *Martinez*, *supra*, 156 Cal.App.4th at p. 855.)

22

Accordingly, we conclude that the prosecutor "provided the ' "minimal" ' amount of independent evidence necessary to satisfy the corpus delicti rule. [Citation.]" (*Gonzalez, supra*, 12 Cal.5th at p. 382.)

**B.** *Substantial Evidence Regarding Driving While Under the Influence*

Defendant contends that there is not substantial evidence that he was driving while under the influence of a drug. He argues that the only reasonable inference of the evidence is that he used methamphetamine *after* he arrived at the location, not before he drove there.

"In considering a challenge to the sufficiency of the evidence to support an enhancement, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] We presume every fact in support of the judgment the trier of fact could have reasonably deduced from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. [Citation.] 'A reviewing court neither reweighs evidence nor reevaluates a witness's credibility.' [Citation.]" (*People v. Albillar* (2010) 51 Cal.4th 47, 59-60 (*Albillar*).) Reversal for lack of substantial evidence "is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' [Citation.]" (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)

In this case, Officer Aguilar testified that defendant reported smoking crystal methamphetamine "last night" and that he had driven to the property within the last five minutes. The officer, who observed the keys in the ignition, sought to confirm that the van was recently driven by touching the hood and found it "warm to the touch." This evidence, along with defendant's admission that he had smoked crystal

23

methamphetamine before driving to the site, is sufficient evidence to sustain a finding that he used methamphetamine prior to driving to the location. (See *People v. Sapp* (2003) 31 Cal.4th 240, 304 [if there is evidence satisfying the corpus delicti rule, then " 'the defendant's statements may be considered to strengthen the case on all issues' "].)

Defendant contends on appeal that there were drugs and paraphernalia in the van, that "a homeless encampment is a likely location for someone to both purchase and use narcotics," and that the landowner denied that defendant had been asked to clean the property. According to defendant, under these circumstances the "obvious explanation is that he went to the location to purchase and use drugs," rather than getting "high at home and then [driving]" there.

To accept defendant's argument would require us to reweigh the evidence, which we cannot do. (*Albillar*, *supra*, 51 Cal.4th at p. 60.) If, as in this case, " ' " ' "the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment." ' [Citations.]" [Citation.]' [Citations.]" (*People v. Cravens* (2012) 53 Cal.4th 500, 508.)

**C. *Substantial Evidence Regarding Impairment of Ability to Drive***

Defendant next contends that although there was evidence that he had methamphetamine in his system, there is "insufficient evidence that it impacted his ability to drive to the degree required within the meaning of the law."

Defendant was convicted of driving "under the influence of [a] drug." (Veh. Code, § 23152, subd. (f).) "The term 'drug' means any substance . . . which could so affect the nervous system, brain, or muscles of a person as to impair, to an appreciable degree, [the person's] ability to drive a vehicle in the manner that an ordinarily prudent and cautious [person], in full possession of his [or her] faculties, using reasonable care, would drive a similar vehicle under like conditions." (*Id.*, § 312; see *id.*, § 100; *People v. Canty* (2004) 32 Cal.4th 1266, 1278.) Thus, to be guilty of DUI of a drug, " ' " 'the . . .

24

drug[] must have so far affected the nervous system, the brain, or muscles [of the individual] as to impair to an appreciable degree *the ability to operate a vehicle* in a manner like that of an ordinarily prudent and cautious person in full possession of his [or her] faculties. [Citations.]' " [Citations.]' [Citation.] It is not enough that the drug could impair an individual's driving ability or that the person is under the influence to some detectible degree. Rather, the drug must actually impair the individual's driving ability. [Citation.]" (*People v. Torres* (2009) 173 Cal.App.4th 977, 983 (*Torres*).)

We determine that substantial evidence supports the jury's finding that methamphetamine " ' " 'so far affected the nervous system, the brain, or muscles [of defendant] as to impair to an appreciable degree *the ability to operate a vehicle* in a manner like that of an ordinarily prudent and cautious person in full possession of his faculties. [Citations.]' " [Citations.]' [Citation.]" (*Torres*, *supra*, 173 Cal.App.4th at p. 983.) The criminalist in this case testified as an expert in drug impairment in a person. The criminalist explained that driving is a "complex divided attention task," "requir[ing] the driver to process information, streetlights, signs, anything going on like . . . kids or people in the walkways." At the same time, the person must physically operate the car by steering, breaking, and using the gas pedal. The criminalist testified that impairment may be demonstrated by field sobriety tests. Field sobriety tests are "simple divided attention tasks." The tests are designed to ask a person to do more than one thing at a time, which allows for an assessment of the person's ability to follow directions and whether they are displaying mental or physical impairment.

Signs of mental impairment from methamphetamine may include being confused, a sped-up perception of time, not understanding directions, and focusing singly on a task while having issues with divided attention tasks. A driver impaired by methamphetamine may drive too fast, fail to respond to red lights, make aggressive lane changes, and have their vision impaired by dilated or constricted pupils that affect how much light is getting

into their eyes. Physical coordination issues and muscle rigidity may affect the ability to operate the steering wheel and brake pedals appropriately.

The criminalist testified that the following symptoms are consistent with methamphetamine impairment: estimating 20 seconds as 30 seconds, poor balance, and failing to follow instructions like turning improperly. The criminalist specifically explained that a person "would be too impaired to operate a motor vehicle safely" if the following symptoms were observed: constricted pupils that could affect vision, rapid pulse that was measured more than once to "counteract" the idea that the person might have been nervous, rapid speech and movements, estimating 20 seconds which shows cognitive impairment based on a sped-up perception of time, rigid muscle tone, separating the feet during a Romberg test which would be a physical coordination issue, elevated blood pressure, inability to maintain balance which is a physical coordination issue, turning incorrectly during the walk-and-turn is a sign of not understanding directions and also a physical coordination issue, leg tremors, and methamphetamine and amphetamine detected in toxicology. Even if the person also had a low body temperature and estimated 30 seconds after the passage of 34 seconds, both of which are not consistent with methamphetamine impairment, the criminalist testified that taking these other facts into consideration would not change the criminalist's opinion that the person in the hypothetical was too impaired to operate a vehicle safely. The criminalist explained that not every person who is impaired by methamphetamine would display every possible sign of impairment.

Consistent with the criminalist's opinion regarding a person who "would be too impaired to operate a motor vehicle safely," defendant had constricted pupils as observed by Officer Aguilar and consistent with defendant's admission to Officer Eckerfield that he had used methamphetamine for years, a rapid pulse that was measured multiple times by Officer Aguilar and Officer Eckerfield, rapid speech, estimated 30 seconds after the passage of only 20 seconds, separated his feet instead of keeping them together as

26

instructed during a Romberg test, elevated blood pressure, was unable to maintain balance and failed to follow instructions by turning incorrectly during the walk-and-turn, leg tremors, and methamphetamine and amphetamine detected in toxicology testing. In sum, in addition to toxicology testing demonstrating methamphetamine and amphetamine in defendant's system, defendant displayed signs and symptoms of being under the influence methamphetamine, including problems with his time perception, balance, physical coordination, ability to follow directions, and ability to do more than one task at a time as reflected in field sobriety or other tests that he was asked to perform by the CHP. This evidence combined with the criminalist's expert testimony regarding impairment provided substantial evidence that a drug "actually impair[ed] [defendant's] driving ability." (*Torres*, *supra*, 173 Cal.App.4th at p. 983.)

Defendant contends that the hypothetical posed to the criminalist, who was the prosecution's expert on impairment, included two facts that were not supported by the evidence: (1) stepping off the line during a test and (2) rigid muscle tone.

Defendant's argument does not demonstrate a lack of substantial evidence. First, although the hypothetical posed to the criminalist included the fact that the person stepped off the line during a test, the criminalist did not subsequently recite that fact when she specified which facts from the hypothetical formed the basis for her opinion that the person was too impaired to drive. In other words, stepping off the line was not a factor in the criminalist's opinion regarding impairment. Second, regarding rigidity, although it does not appear from the record that any witness testified that defendant had rigid muscle tone, we observe that both the prosecutor and defendant's trial counsel posed hypotheticals to their respective expert witnesses that included a person having rigid muscle tone. Nevertheless, when the criminalist identified the various "physical signs of impairment" from methamphetamine, the criminalist testified that a person "may have rigid muscle tone and muscle and coordination issues," among other physical signs. The criminalist further explained that physical coordination issues include poor balance,

which are reflected when a person separates the feet during a Romberg test, turns incorrectly during the walk-and-turn, or otherwise shows an inability to maintain balance. Defendant displayed all these examples. Given the criminalist's testimony that not every person who is impaired by methamphetamine will display every possible sign of impairment, that rigid muscle tone was only one of several possible physical symptoms of impairment, and the evidence of defendant's other physical symptoms, as well as mental symptoms, reflecting impairment, defendant fails to demonstrate that the record lacks substantial evidence of his impairment to drive.

Defendant also refers to the fact that he reported having prior injuries, and that those injuries may have been the reason for his physical impairment. However, Officer Eckerfield testified that he completed a medical screening of defendant before the tests were conducted and defendant met the guidelines for being able to perform the tests.

Next defendant contends that the criminalist's opinion was "not . . . relevant" to defendant's condition, because the hypothetical presented by the prosecutor "included only one of the [m]odified Romberg tests and ignored the subsequent tests that demonstrated accurate or slowed down perception of time. It also excluded other significant details that were part of the whole picture that each of the experts testified must be considered." Defendant also argues that the criminalist's opinion "was contradicted by the defense expert, who was given a hypothetical with more details regarding the actual observations of [defendant]."

We are not persuaded that there was a lack of substantial evidence of defendant's impairment based on these arguments. First, contrary to defendant's assertion, the criminalist was questioned about a hypothetical person who had an accurate time perception. The criminalist first testified on direct examination, based on a hypothetical, that a person was too impaired to drive safely if the person exhibited certain signs and symptoms of being under the influence of methamphetamine, including during field sobriety and/or other tests, such as by having a sped-up perception of time. On cross-

28

examination, the criminalist was then asked about other symptoms that were not consistent with methamphetamine use, such as low body temperature and having a normal perception of time by estimating 30 seconds after the passage of 34 seconds. On redirect, the criminalist testified that taking these other facts into consideration would not change the criminalist's opinion that the person in the hypothetical was too impaired to operate a vehicle safely. The criminalist explained that not every person who is impaired by methamphetamine would display every possible sign of impairment, but that there were enough factors in the hypothetical to determine that the person was too impaired to operate a motor vehicle safely. Second, regarding the competing expert opinions, both experts were presented with hypotheticals and it was up to the jury to evaluate each expert's opinion, including the reasons given for the opinion and the facts upon which each expert relied, and to weigh the competing opinions against each other. (See CALCRIM No. 332.) On appeal, in conducting a substantial evidence review, we can " 'neither reweigh[] evidence nor reevaluate[] a witness's credibility.' [Citation.]" (*Albillar*, *supra*, 51 Cal.4th at p. 60.)

We understand defendant to contend that one or more of the tests administered to him by the CHP were not sufficient to show methamphetamine impairment because one or more of the tests had been validated to determine only alcohol impairment. However, defendant's own expert, former CHP Officer Martorana, acknowledged that when he was out in the field, he conducted drug recognition evaluations on people who he suspected of being under the influence of methamphetamine. He used the tests that had been discussed during trial, including the "[m]odified Romberg" and finger-to-nose, to make arrests of people who were under the influence of methamphetamine. He had also trained CHP officers and allied agencies to use the tests. Significantly, Martorana believed the "totality of the 12 steps" of a drug recognition evaluation were appropriate to determine whether a person was under the influence of methamphetamine. The criminalist likewise testified that impairment may be demonstrated by field sobriety tests.

29

Defendant next contends that the evidence in this case is similar to *Torres*, *supra*, 173 Cal.App.4th 977, where the appellate court reversed the defendant's conviction for misdemeanor DUI of a drug (methamphetamine) due to insufficient evidence. (*Id.* at pp. 979, 984.) We find *Torres* distinguishable. In that case, the toxicologist testified that "[t]o determine whether a person is under the influence of methamphetamine for driving purposes, [the toxicologist] would need to see field sobriety tests such as the Romberg exam, which assesses time perception, and any other tests that assess the person's balance, coordination, ability to follow instructions, and ability to focus on multiple tasks at once." (*Id.* at p. 982.) However, the police "did not conduct any field sobriety tests or other tests to measure [the defendant's] balance, coordination, concentration, or divided attention." (*Id.* at p. 981.) The appellate court determined that although there was substantial evidence that the defendant was "under the influence of methamphetamine" when he was arrested and that "methamphetamine use can impair a person's judgment, focus, and psychomotor skills in ways that might make the person an unsafe driver," there was "no evidence [the defendant's] methamphetamine use actually impaired his driving ability on the night of his arrest." (*Id.* at p. 983.)

In this case, in contrast to *Torres*, there was evidence of defendant's poor performance on field sobriety or other tests that he was asked to perform by CHP officers. Those tests showed, among other things, defendant's inability to balance, lack of coordination, inability to follow instructions, and inability to focus on multiple tasks at one time. (See *Torres*, *supra*, 173 Cal.App.4th 977 at p. 982.)

Defendant also relies on *People v. Davis* (1969) 270 Cal.App.2d 197 (*Davis*), where the appellate court concluded that the defendant's conviction for DUI of a drug could not stand. (*Id.* at pp. 197, 200.) Although the defendant had needle punctures in his arms and observations were made regarding his pupils and respiration (*id.* at p. 198), he otherwise "appeared to be 'normal,' " including "[h]is Romberg was okay" (*id.* at p. 199). The appellate court explained that "[t]here was neither expert opinion nor the

30

observation of anyone that defendant lacked the alertness, judgment and coordination which are needed to operate a motor vehicle in a prudent and cautious manner." (*Id.* at p. 200.)

In contrast to *Davis*, as we have explained in this case there was evidence of defendant's poor performance on field sobriety or other tests that he was asked to perform by CHP officers. Those tests showed, among other things, defendant's inability to balance, lack of coordination, inability to follow instructions, and inability to focus on multiple tasks at once. The criminalist, who testified as an expert, determined that someone exhibiting signs and symptoms similar to defendant would be too impaired to operate a vehicle safely.

We are also not persuaded by defendant's reliance on *People v. Bassett* (1968) 69 Cal.2d 122 (*Bassett*) and *In re M.S.* (2021) 70 Cal.App.5th 728 (*M.S.*). In *Bassett*, the California Supreme Court addressed the insufficiency of the expert psychiatric testimony regarding whether the defendant, who suffered from paranoid schizophrenia, had the mental capacity to have the state of mind necessary to be found guilty of first degree murder. (*Bassett*, *supra*, at pp. 124-126, 140-148.) In *M.S.*, the appellate court examined the insufficiency of the evidence regarding whether the minor's weapon was capable of temporarily immobilizing another person and therefore qualified as a stun gun. (*M.S.*, *supra*, at pp. 730, 732-734.) Neither of these cases dictates that the expert testimony in this case concerning impairment to drive, along with the other evidence admitted in this case, was insufficient to establish that defendant was too impaired to drive safely.

Lastly, in his reply brief, defendant seeks to rely on information from the preliminary hearing and from the probation report, such as details concerning medical treatment for his prior injuries and his medication routine. Without a record citation reflecting that this information was admitted into evidence at trial, we decline to consider such information in relation to defendant's sufficiency of the evidence argument on appeal.

31

Accordingly, we determine that substantial evidence supports the jury's finding that a drug impaired defendant's driving ability. (See *Torres*, *supra*, 173 Cal.App.4th at p. 983.)

## D. *Prosecutorial Misconduct*

Defendant contends that the prosecutor committed several instances of misconduct in argument to the jury by alleging facts not in evidence, misstating the evidence, denigrating the defense, misstating the law, vouching for a prosecution witness, and expressing the personal opinion that defendant was guilty. Defendant argues that the prosecutor's conduct violated defendant's state and federal constitutional due process rights to a fair trial. Acknowledging that his trial counsel failed to object below, defendant contends that his claims of prosecutorial misconduct fall under various exceptions to the waiver rule and/or his trial counsel rendered ineffective assistance of counsel.

The Attorney General contends that defendant forfeited his objections by failing to raise them below, that trial counsel did not render ineffective assistance of counsel, and that on the merits the prosecutor did not commit misconduct in argument.

### 1. General Legal Principles Regarding Prosecutorial Misconduct

" ' "The applicable federal and state standards regarding prosecutorial misconduct are well established." ' " (*People v. Wright* (2021) 12 Cal.5th 419, 443.) " ' " 'A prosecutor's . . . intemperate behavior violates the federal Constitution when it comprises a pattern of conduct "so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process." ' " ' [Citations.] " (*People v. Suarez* (2020) 10 Cal.5th 116, 175.) "Misconduct that falls short of a federal due process violation may nevertheless violate state law if it 'involves the use of deceptive or reprehensible methods to persuade the court or jury.' [Citation.]" (*People v. Dworak* (2021) 11 Cal.5th 881, 910.)

"When attacking the prosecutor's remarks to the jury, the defendant must show that, '[i]n the context of the whole argument and the instructions' [citation], there was 'a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner. [Citations.] In conducting this inquiry, we "do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements. [Citation.]' [Citations.]" (*People v. Centeno* (2014) 60 Cal.4th 659, 667 (*Centeno*).)

"To preserve a misconduct claim for review on appeal, a defendant must make a timely objection and ask the trial court to admonish the jury to disregard the prosecutor's improper remarks or conduct, unless an admonition would not have cured the harm. [Citation.]" (*People v. Davis* (2009) 46 Cal.4th 539, 612.)

## 2. Analysis

Defendant acknowledges that his trial counsel failed to object to any of the prosecutor's statements that defendant now contends amounted to prosecutorial misconduct. Defendant also acknowledges that ordinarily an appellate claim of prosecutorial misconduct under these circumstances would be deemed forfeited. Defendant nevertheless contends that this court should address the substance of his appellate claim because various exceptions to the forfeiture rule apply, this court has the discretion to consider the claim even if forfeited, and/or his trial counsel rendered ineffective assistance of counsel by failing to object. Regardless of whether we consider the claim of error directly or as part of claim of ineffective assistance of counsel, as we shall explain defendant fails to demonstrate prejudicial error warranting reversal.

### a. *Alleging facts not in evidence, misstating the evidence, and denigrating the defense*

First, defendant contends that the prosecutor in argument to the jury referred to facts not in evidence. Specifically, in contending that defendant had only recently driven to the property, the prosecutor argued that the landowner "would have noticed it earlier.

33

She would have said that she recognized the van from earlier in the day or from another time." Defendant contends that there was no testimony to support this argument. Rather, the landowner testified that she arrived about five minutes before the CHP and the van was already present. Thus, according to defendant, the landowner could not have "noticed it earlier" because the van was already present when she arrived.

Defendant fails to establish prejudicial misconduct by the prosecutor's argument. The landowner testified that she had never seen defendant before that day, and she did not ask him to come to her property. Defendant likewise indicated to Officer Aguilar that he had yet to talk to the landowner about his presence on the property. Evidence admitted at trial also established that defendant had only recently driven to the property, including Officer Aguilar's testimony that the van's hood was still warm, the keys were still in the ignition, and defendant's own statement that he had arrived five minutes earlier. Defendant fails to demonstrate " 'a reasonable likelihood the jury understood or applied the complained-of comments' " regarding the landowner not noticing or recognizing the van earlier " 'in an improper or erroneous manner' " (*Centeno*, *supra*, 60 Cal.4th at p. 667) and that defendant was prejudiced as a result.

Second, defendant contends that the prosecutor improperly argued as follows, "[A]s everybody here knows, meth is everywhere in Monterey County." Defendant argues that this statement "appealed to facts not relevant or presented in evidence, but that would encourage a verdict in [the prosecution's] favor."

Defendant fails to establish prejudicial misconduct by the prosecutor's statement. The above-quoted statement was made in the context of the prosecutor arguing that Officer Aguilar, a 25-year CHP officer, had had numerous contacts with people who have used methamphetamine and that the officer recognized the signs and symptoms of methamphetamine in defendant, who was an admitted chronic user. At trial, Officer Aguilar testified that in his 25 years as a CHP officer, he had "come across a lot of people under the influence of meth." The evidence at trial also reflected that defendant was an

34

admittedly long-time user of methamphetamine, he had recently smoked methamphetamine, he had more than a therapeutic level of methamphetamine in his blood, and the usable amount of methamphetamine in the van was his. Defendant fails to demonstrate " 'a reasonable likelihood the jury understood or applied the complained-of comments' " regarding the prevalence of methamphetamine in the county " 'in an improper or erroneous manner' " (*Centeno*, *supra*, 60 Cal.4th at p. 667) and that he was prejudiced as a result.

Third, defendant contends that the prosecutor misstated the evidence when referring to the hypothetical given to the criminalist, who was the prosecution's expert witness on impairment. In particular, the prosecutor argued to the jury that the criminalist was given a hypothetical that "included all the bad facts" for the prosecution's case, including that defendant estimated 30 seconds as 34 seconds on the modified Romberg, and that the criminalist still determined that defendant was impaired. According to defendant, his 34-second test result was not included in the hypothetical given to the prosecution's expert, nor were other facts that were not consistent with impairment. Defendant contends that, at the same time, the prosecutor improperly argued to the jury that defendant's trial counsel only posed "isolate[d]" facts to the defense expert on impairment and those facts were the facts that were "good to [the defense] side of the case." According to defendant on appeal, the hypothetical posed to the defense expert "actually included some negative facts."

We are not persuaded that the prosecutor committed prejudicial misconduct when discussing the hypotheticals posed to each side's expert witness. Regarding the hypothetical posed to the prosecution's expert, although it did not initially include on direct examination some "negative facts" (as characterized by defendant on appeal), such as an estimate of 30 seconds after the passage of 34 seconds, this fact concerning 34 seconds and other facts that were not necessarily consistent with methamphetamine impairment *were* posed to the prosecution's expert on cross-examination. Then, on

35

redirect, the prosecution's expert testified that taking these other facts into consideration would not change her opinion that the person in the hypothetical was too impaired to operate a vehicle safely. The prosecution's expert testimony as a whole thus encompassed a hypothetical that included both positive and negative facts for both sides.

Regarding the questions posed by defendant's trial counsel to the defense expert, the record reflects that, *consistent* with the prosecutor's argument to the jury, defendant's trial counsel initially only posed "isolate[d]" facts to the defense expert and those facts were "good to [the defense] side of the case" or were otherwise not necessarily indicative of methamphetamine use. Specifically, in a series of questions to the defense expert, defendant's trial counsel asked about a person whose eyes are within normal range, who estimates 30 seconds in 34 seconds, who has an internal body temperature of 96.2 degrees, who walks down a hill without stumbling, who is talkative in their normal speech pattern, who touches the tip of his or her nose with the pad rather than the tip of the finger, who has horizontal gaze nystagmus, or who has previously broken both knees and back and suffered a concussion from a traffic collision a year prior. Only after this series of questions to the defense expert addressing factors favorable to the defense did defendant's trial counsel pose to the defense expert a hypothetical that included "some negative facts." However, the prosecutor never argued to the jury that the *hypothetical* posed to the defense expert did not contain facts negative to the defense. Instead, the prosecutor was apparently referring to the earlier series of questions that we have just described which posed to the defense expert "isolate[d]" individual facts that were only "good to [the defense] side of the case."

Fourth, defendant contends that the prosecutor improperly denigrated the defense expert, the former CHP Officer Martorana, and argued that the defense was fabricated. Specifically, the prosecutor argued the following to the jury: "And then the defense has this expert come in. Right? And I would like to point out the fact that the expert that the defense hired, right, and this is a cottage industry, these DUI experts who testify for the

36

defense. Right? If they testify well, then they get a referral. They testify in another case, and they get more money. Right? [¶] So they're coming in here and they have a financial incentive for their own businesses in order to give an opinion that the defense attorney is happy with. That's the industry. That's DUI defense industry. It's a game for them." The prosecutor a short time later argued, "And he comes in here and he trash talks these FSTs, right? It turns out the basis for his expertise, the whole reason he's getting paid is this 18-year CHP career where he made arrests based on these FSTs. He was a DRE based on these FSTs. He trained other people to arrest people based on these FSTs. [¶] And can you see the fact that he's just one of these paid cottage industry DUI defense people, because he comes in here and he trash talks his entire career, the basis for what he was doing, in order to render this paid opinion. But then it just -- I mean, can you -- I hope that you can also see what he's doing. So he says these are not scientifically validated, and it's just --."

"It is not misconduct to comment on the role of defense counsel as an advocate. [Citation.]" (*People v. Powell* (2018) 6 Cal.5th 136, 172 (*Powell*).) "Argument may not denigrate the integrity of opposing *counsel*, but harsh and colorful attacks on the credibility of opposing *witnesses* are permissible. [Citations.] Thus, counsel is free to remind the jurors that a paid witness may accordingly be biased and is also allowed to argue, from the evidence, that a witness's testimony is unbelievable, unsound, or even a patent 'lie.' [Citations.]" (*People v. Arias* (1996) 13 Cal.4th 92, 162 (*Arias*).)

Defendant fails to demonstrate misconduct by the prosecutor in this case. The prosecutor did not denigrate the integrity of opposing counsel and instead only focused on the credibility of the paid defense expert witness. The California Supreme Court has determined that the following comments were not misconduct: (1) implying the defense expert witness was " 'paid a hundred dollars for his testimony' " and that he was "a 'so-called expert, so-called because a real scientist would never stretch any [principle] for a buck' " (*Arias*, *supra*, 13 Cal.4th at p. 162); (2) referring to the fees paid to the defense

37

mental health expert witness by stating, " 'for 124 hours at $ 225 per hour, Dr. Wilkinson comes up with something that excuses this man's responsibility' " (*People v. Cook* (2006) 39 Cal.4th 566, 613); and (3) arguing that the defense expert was part of " 'a whole industry of these defense experts that bounce around from trial to trial, state to state, collecting good money for testimony' " and also suggesting that money had shaped the defense experts' opinions (*People v. Monterroso* (2004) 34 Cal.4th 743, 783-784 & fn. 9). In this case, we find no misconduct based on the prosecutor's similar statements about defendant's paid expert witness.

### b. *Misstating the law*

Defendant contends that the prosecutor misstated the law and improperly appealed to jury sympathy by making the following argument to the jury: "So for impairment, for somebody to be too impaired to drive, it doesn't mean that you're ping-ponging. Doesn't mean you're hitting the fog line, you're hitting the center median line, you're going back and forth. You're obviously driving drunk. It doesn't mean that. [¶] [The criminalist] testified that people who – especially chronic users, as [defendant] admitted he was, people will be able to do routine familiar tasks. Driving around Salinas, for example. *But what you're worried about is when that kid kicks the soccer ball out into the road. Where you will have enough meth affecting you in your system that you will not react with the speed with which you would if you were not under the influence of meth.* [¶] *So any deviation from when you're a sober person, any deviation from that that the drugs caused, constitutes impairment.* So it doesn't mean you're wigging out on the road. *Doesn't mean you're methed up and doing 95 miles an hour. It just means that if a situation comes up, you're not going to be able to react to it as quickly.* Or you have these divided attention tasks. You got your foot on the pedal. You know, you've got your other -- your hand on the wheel. You've got your other hand tuning the radio. And then you got your eyes looking out. All right. That's four separate tasks. So that means that the meth that you have in your system would impair your ability to do that. *And it*

*just deviates even a little bit from when you were sober. That counts. Because what we want on the road is sober drivers, not people who are affected by drugs*." (Italics added.) The prosecutor later asked, "So what do we know about impairment?" and proceeded to discuss the evidence in the case, including the signs and symptoms of methamphetamine usage by defendant, his performance on field sobriety tests, the drug recognition evaluation, and the toxicology testing.

Defendant contends that the "degree of impairment cannot be slight, or a little bit of a deviation," which, according to him, was the argument of the prosecutor. Quoting *Torres*, defendant contends that the drug " ' " 'must have so far affected the nervous system, the brain, or muscles [of the individual] as to impair to an appreciable degree *the ability to operate a vehicle* in a manner like that of an ordinarily prudent and cautious person in full possession of his faculties. [Citations.]' " [Citations.]' [Citation.] It is not enough that the drug could impair an individual's driving ability or that the person is under the influence to some detectible degree. Rather, the drug must actually impair the individual's driving ability. [Citation.]" (*Torres*, *supra*, 173 Cal.App.4th at p. 983.) Defendant further argues that the prosecutor "improperly appealed to the jury to convict for a greater societal 'purpose' " and improperly "reference[d] parts of [the] judicial process separate from the trial."

"It is improper for the prosecutor to misstate the law generally, and in particular, to attempt to lower the burden of proof. [Citations.]" (*People v. Ellison* (2011) 196 Cal.App.4th 1342, 1353 (*Ellison*).) Here, we are not persuaded that " '[i]n the context of the whole argument and the instructions' [citation], there was 'a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner.' " (*Centeno*, *supra*, 60 Cal.4th at p. 667.) The clear import of the prosecutor's argument was that impairment did not need to rise to the level of a person who is "wigging out on the road" and "doing 95 miles an hour." Instead, impairment could occur when a person who is under the influence of a drug is unable to react as a sober

person would, meaning, for example, reacting as a person who is able to complete divided attention tasks including a foot on the gas, a hand on the wheel, looking out the vehicle, and so forth. The prosecutor's argument is also understood in the context of the testimony by the criminalist, who explained, that "it's not uncommon for impaired people to be able to do a familiar task for a short period of time. So if they're driving a familiar car on a familiar route, . . . they can do those and not appear impaired. It's when something abnormal happens. So a light turns red and they weren't ready for it. Or a soccer ball goes in the road. . . . Then they may show their impairment." The prosecutor's argument paralleled this testimony of the criminalist. Further, the trial court instructed the jury on the law regarding DUI, including that "[a] person is under the influence if, as a result of taking a drug, his or her mental or physical abilities are so impaired that he or she is no longer able to drive a vehicle with the caution of a sober person, using ordinary care, under similar circumstances." Defendant's trial counsel also reiterated the legal standard in argument to the jury. On this record, defendant fails to demonstrate that the prosecutor's argument denied due process or amounted to a deceptive or reprehensible method to persuade the jury.

Defendant's reliance on *Ellison*, *supra*, 196 Cal.App.4th 1342, does not advance his claim of prosecutorial misconduct in this context. In *Ellison*, the prosecutor expressly discussed the reasonable doubt standard incorrectly. (See *id.* at pp. 1351-1352.) As explained by the appellate court, "the prosecutor improperly attempted to lessen the People's burden of proof by arguing to the jury that the beyond-reasonable-doubt standard required the jury to determine whether defendant's innocence was reasonable." (*Id.* at p. 1353.) For example, the prosecutor argued, " '*The basis for reasonable doubt. This seems obvious, but [it] is whether the doubt that you have is reasonable. There's all kinds of possibilities. The Judge told you that it's not beyond all possible doubt. Is it possible that [the victims] somehow conspired together when nothing happened to call 911 and report a friend for making threats and pointing a gun at their face? And the gun*

40

is found? Yeah, it's possible. There's lots of possibilities, but it's not reasonable. People don't do that when nothing happens with nothing to provoke it. It's—*you have to look at whether or not it's reasonable or unreasonable for the defendant to be innocent.*' " (*Id.* at p. 1351, italics added.)

In contrast to *Ellison*, the prosecutor in the present case did not expressly refer to an incorrect reasonable doubt standard. Rather, the prosecutor discussed impairment. As we have explained, there was not " 'a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner' " when considering the prosecutor's impairment discussion " 'the context of the whole argument and the instructions.' " (*Centeno*, *supra*, 60 Cal.4th at p. 667.)

We are also not persuaded that the prosecutor's reference to a child who kicks a soccer ball into the road constituted prejudicial misconduct. As we have explained, the prosecutor's argument was in reference to the criminalist's testimony that contrasted an impaired person being able to drive a familiar route but showing impairment when "a soccer ball goes in the road." We do not believe the prosecutor's single reference to a child when referring to this testimony by the criminalist amounted to prejudicial misconduct.

Defendant also argues that the prosecutor misstated the law and misrepresented the evidence by stating: "[*Defendant*] *says*, 'I smoked meth last night.' Which timeline wise doesn't totally make sense. Because, *you know,* [*the criminalist*] *testified it's within 12 hours that they would still be feeling the effects. So even if you go -- based on his own words, he counts as impaired based upon the science of it.* But he also said last night. And we don't know if he gave the exact estimate. We don't know if he actually smoked in the morning and he's trying to minimize to that officer." (Italics added.) Defendant contends that although there was testimony that the "residual effects" of methamphetamine can be felt up to 12 hours, there was no testimony that after 12 hours a person would still be impaired within the meaning of the law.

41

We are not persuaded by defendant's contention that the prosecutor's argument amounted to misconduct. The criminalist indicated that some effects of methamphetamine could be felt up to 12 hours after use. Given that the exact time that defendant had last used methamphetamine was not clear, other than defendant self-reporting to the CHP that he had taken it around 1:00 a.m., it was not improper for the prosecutor to argue that "the science of it" supported a finding that defendant was impaired by methamphetamine if he drove within 12 hours of usage. Indeed the jurors also had evidence regarding the elevated level of methamphetamine in his system and his performance on field sobriety and other tests by the time of his contact with law enforcement. And the criminalist indicated, based on a hypothetical, that a person such as defendant would be too impaired to drive a vehicle safely. Thus, the trial evidence supported the prosecutor's "science" argument, and no misconduct has been shown.

Defendant next contends that the prosecutor improperly shifted the burden of proof to the defense by arguing to the jury: "Everything that we have found, that Officer Aguilar found, confirms that [defendant] drove there. *There's nothing in the evidence before you that shows that he did not. There's nothing that you have in the evidence that says that he was not the driver.* And everything about him driving lines up." (Italics added.) The prosecutor also argued, "One thing I'd also like to point out is one of the explanations put forward by the defense is maybe all these people who were out at the hill arrived in that van together. Right? *I haven't heard a reasonable explanation for who was driving at all from the defense.* That's the best that we have gotten, that they've gotten, that all these people at the hill drove over together." (Italics added.)

Defendant similarly contends that the prosecutor encouraged the jury to convict under a lower standard of proof by arguing to the jury: "And you think, here's the big picture view. What's more reasonable? That [defendant] was driving under the influence, or that a clown car arrived with all these people to clean up trash at some

42

random abandoned site, and this meth pipe that -- and meth and driving that [defendant] admitted to, somehow you shouldn't believe that. Come on. Convict him. He's guilty."

We are not persuaded that " '[i]n the context of the whole argument and the instructions' [citation], there was 'a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner.' " (*Centeno*, *supra*, 60 Cal.4th at p. 667.) Regarding the prosecutor's reference to the evidence of defendant driving and criticism of the defense theory that several people arrived in the van together, " '[p]rosecutors may attack the defense case and argument. "Doing so is proper and is, indeed, the essence of advocacy." ' [Citation.]" (*People v. Krebs* (2019) 8 Cal.5th 265, 342.) "Misconduct claims . . . have been rejected where the prosecutor anticipates the flaws likely to appear in counsel's closing argument based on evidence that was introduced [citation], and where the prosecutor criticizes the defense theory of the case because it lacks evidentiary support [citation]." (*People v. Bemore* (2000) 22 Cal.4th 809, 846; see *People v. Gonzales* (2012) 54 Cal.4th 1234, 1296-1297.) Regarding the prosecutor's arguments about what was "reasonable," the prosecutor in making these arguments never stated that the burden of proof or the reasonable doubt standard could be satisfied by the jury simply deciding what was more reasonable. Further, the jury was repeatedly instructed by the trial court that the prosecutor had the burden to prove defendant's guilt beyond a reasonable doubt. In addition, the jury was instructed pursuant to CALCRIM No. 224 that to find defendant guilty based in circumstantial evidence, the jury "must be convinced that the only reasonable conclusion supported by the circumstantial evidence is that the defendant is guilty"; if "two or more reasonable conclusions" can be drawn from the circumstantial evidence, "and one of those reasonable conclusions points to innocence and another to guilt," the jury "must accept the one that points to innocence"; and that "when considering circumstantial evidence," the jury "must accept only reasonable conclusions and reject any that are unreasonable." The prosecutor's argument was consistent with this instruction.

### c. *Vouching for a prosecution witness*

We understand defendant to contend that the prosecutor committed misconduct by vouching for one of the CHP witnesses, Officer Aguilar. In making this argument, defendant cites to the following portions of the prosecutor's argument to the jury: "When he [Officer Aguilar] contacted [defendant], he noticed that [defendant] was displaying objective signs and symptoms of intoxication. *And, remember, this is a CHP officer who has been an officer, has been patrolling for 25 years. And he knows the objective signs and symptoms of methamphetamine because that's his job. That's what CHP officers do. Is not like a Salinas PD officer or a Sheriff where their duties vary widely . . . . CHP officers, their primary duties, what they do most often is vehicle crimes on the road. Most often that's driving under the influence. So that's what they're good at. That's what CHP is great at.*" (Italics.)

The prosecutor also later argued, "Now, the defense expert made a big fuss about this and said, Well, he [Officer Aguilar] didn't touch any of this -- you know, the rest of the vehicle. He didn't put his finger up and feel the wind. Right? *But this is a CHP officer who has been doing vehicle crimes, DUI investigations for 25 years*. He's been a DRE for -- since 2001. [¶] So this is an experienced officer. He touched the hood. He felt it was warm from recent driving, which corroborates the statement that [defendant] gave to him."

The prosecutor further argued, "You take a broad view of these things and you take everything together and use your common sense. [¶] That's why we have people from the community and we don't have specialists do it. We have just everybody from every walk of life comes in and serves on the jury. Use your common sense. It makes sense. Why would Officer Aguilar conduct a DUI investigation if [defendant] . . . hadn't told him that he had just driven up, if [defendant] wasn't displaying those signs of intoxication. Why would he have done that? Why would he have caused the unnecessary headache. *Now, this CHP officer, he's just trying to make sure that they're*

44

*not somebody intoxicated out on the road.* That's his job." (Italics added.) Later, after summarizing the evidence showing that defendant had driven to the property, the prosecutor argued that "*at this point the investigation looks really good* in terms of [defendant] just drove up here."

"[A] 'prosecutor is prohibited from vouching for the credibility of witnesses or otherwise bolstering the veracity of their testimony by referring to evidence outside the record.' [Citation.]" (*People v. Turner* (2004) 34 Cal.4th 406, 432-433.) " 'However, so long as a prosecutor's assurances regarding the apparent honesty or reliability of prosecution witnesses are based on the "facts of [the] record and the inferences reasonably drawn therefrom, rather than any purported personal knowledge or belief," [the prosecutor's] comments cannot be characterized as improper vouching.' [Citation.]" (*People v. Stewart* (2004) 33 Cal.4th 425, 499, italics omitted.)

In this case, we are not persuaded by defendant's contention that the prosecutor engaged in improper vouching. The evidence admitted at trial reflected that Officer Aguilar had been employed by the CHP for 25 years. He had received 52 hours of DUI training at the academy, an additional 24 hours of advanced drug training, plus a further 72 hours of training and certification as a drug recognition evaluator in 2001, with continual recertifications thereafter. As a CHP officer, Officer Aguilar had been on "[r]oad patrol for about 24 years." Although he "got a desk job" in the year prior to trial, he still was on patrol for "roving DUI, speed enforcement-type" assignments. Officer Aguilar testified that while on regular patrol, the number of stops he conducted varied from one to 20 per day, with an average of "[p]robably at least ten." The officer further testified that "[u]sually on a stop, you're going to enforce the Vehicle Code." Officer Aguilar had been involved in "[p]robably over 500" DUI investigations. He had encountered "a lot of people under the influence of meth" during his 25 years on the job. When asked at trial whether "pretty much every CHP stop you're trained to look to see if people are under the influence," Officer Aguilar responded, "Well, you look for

45

indicators. I mean, usually you stop them for like a speed violation or something that catches your attention. And yeah, you know, that's one of our pet -- not our pet peeves. But, you know, to take DUI drivers off the road." On this record, we are not persuaded that the prosecutor engaged in improper vouching by referring to Officer Aguilar's training and experience in particular, or to the primary duties of CHP officers in general. Further, defendant's reference to the prosecutor's argument that "*at this point the investigation looks really good*" is taken out of context by defendant and does not reflect improper vouching by the prosecutor.

### d. *Expressing the personal opinion that defendant was guilty*

Lastly, defendant contends that the prosecutor improperly expressed a personal opinion as to defendant's guilt during rebuttal argument by stating, "Totality of the circumstances, what we want you to do -- what you should do, I mean, if you just think about it, you look at how the facts fit together. That's what totality of the circumstances is. So you may have these outlying facts. You may have things that don't. But you look at how it all works together. You don't ignore anything. You consider everything. [¶] And you think, here's the big picture view. What's more reasonable? That [defendant] was driving under the influence, or that a clown car arrived with all these people to clean up trash at some random abandoned site, and this meth pipe that -- and meth and driving that [defendant] admitted to, somehow you shouldn't believe that. *Come on. Convict him. He's guilty*. Thank you." (Italics added.)

A prosecutor " ' "may not express a personal belief in defendant's guilt, in part because of the danger that jurors may assume there is other evidence at [the prosecutor's] command on which [the prosecutor] bases this conclusion." ' [Citation.]" (*Powell*, *supra*, 6 Cal.5th at p. 172; accord, *People v. Bain* (1971) 5 Cal.3d 839, 848.) Here, however, the prosecutor in making the challenged statements, "Come on. Convict him. He's guilty," did not expressly indicate that he believed defendant was guilty or that it was his opinion that defendant was guilty. Instead, the prosecutor made the challenged statements in the

context of discussing what the evidence showed. Where the prosecutor's statement is "made in passing in the context of urging what the evidence showed," "the jury was unlikely to have understood the comment as referencing evidence beyond the record." (*Powell*, *supra*, at p. 172.)

Accordingly, we determine that defendant fails to establish a basis for reversing the judgment.

## IV. DISPOSITION

The judgment is affirmed.

                                        _____
                                        BAMATTRE-MANOUKIAN, ACTING P.J.


WE CONCUR:


_____
DANNER, J.


_____
WILSON, J.


*People v. Turpin*
**H049252**